IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| MATTHEW O., | ) | |
| Plaintiff, | ) | Civil Action No. 3:23-cv-00008 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY, | ) | By:  Joel C. Hoppe |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Matthew O. asks this Court to review the Commissioner of Social Security's

("Commissioner") final decision denying his application for disability insurance benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The case is before me

by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the

parties' briefs, and the applicable law, I cannot find that the Commissioner's final decision is

supported by substantial evidence. Accordingly, I respectfully recommend that the presiding

District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C.

§ 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th

1

Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*,

858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4).[1] The claimant bears the burden

of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to

prove that the claimant is not disabled. *See id.*

## II. Procedural History

In a previous application, Matthew filed for DIB and supplemental security income

("SSI") on September 29, 2016, alleging that he became disabled on June 1, 2012. *See*

Administrative Record ("R.") 69, 81. An ALJ issued a fully favorable decision on July 13, 2018,

approving a "closed period" of benefits, R. 38, finding that Matthew was under a disability "from

May 15, 2012[,] through September 1, 2017," R. 65–67 (citing 20 C.F.R. §§ 404.1520(g),

416.920(g)). As relevant here, this ALJ that found Matthew's debilitating lower back pain with

leg weakness, as well as serious side effects from pain medications, likely would have caused

him to miss at least four days of work every month and to be off-task for at least fifteen percent

of an eight-hour workday. *See* R. 73–74. On September 2, 2017, Matthew "returned to full-time

work with no significant medical restrictions." R. 76. He stopped working again in March 2019.

*See* R. 190.

Matthew protectively filed this DIB claim in February 2020. R. 81, 190–91. He alleged

that he became disabled on March 10, 2019, from lower back arthritis, degenerative disc disease,

anxiety, depression, and panic attacks. R. 237. Matthew was thirty-two years old on his alleged

onset date, R. 223, making him a "younger person" under the regulations, 20 C.F.R. §

404.1563(c). Disability Determination Services ("DDS"), the state agency, denied Matthew's

claim initially on November 24, 2020, R. 78–99, and upon reconsideration on October 13, 2021,

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the Commissioner's final written decision.

R. 100–08. On June 7, 2022, Matthew appeared with counsel and testified by telephone at an administrative hearing before ALJ Brian Rippel. *See* R. 36–56. A vocational expert ("VE") also testified at the hearing. R. 57–63.

ALJ Rippel issued an unfavorable decision on August 2, 2022. R. 17–29. At step one, he found that Matthew had not engaged in substantial gainful activity since March 10, 2019. R. 19. At step two, ALJ Rippel found that Matthew had one "severe" medically determinable impairment ("MDI"), which he characterized as a "spine impairment (including lumbar degenerative disc disease, spondylosis, and right lumbar radiculopathy)." *Id.* He found "all other impairments alleged in the record to be non-severe, including [Matthew's] irritable bowel syndrome." R. 20. Matthew's primary care provider assessed him with IBS in July 2019 and refilled two medications for that condition in August 2020. *Id.* (citing R. 526, 536). The ALJ found that Matthew's IBS was a non-severe MDI because it had "been responsive to medication, not required significant medical treatment, [and] not resulted in any continuous exertional or non-exertional functional limitations." *Id.* At step three, ALJ Rippel found that Matthew's severe spine impairment did not meet or medically equal the relevant Listing. R. 21 (citing 20 C.F.R. pt. 404, subpt. P., app. 1 § 1.15).

Next, ALJ Rippel determined that Matthew had the residual functional capacity ("RFC") to do the full range of "light work"[2] but he

> need[ed] the flexibility to alternate between sitting and standing at 1-hour intervals; need[ed] the flexibility to use a cane when walking; [was] limited to only occasional balancing[,] . . . climbing ramps or stairs, stooping, kneeling, or crouching; no

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these strength demands can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per [eight-hour] workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); *see* SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983). ALJ Rippel found that Matthew could meet all these requirements. R. 22; *see also* R. 25 (citing R. 93, 106–07).

crawling or climbing ladders, ropes, or scaffolds; and [could tolerate] only occasional exposure to cold or heat extremes, vibration, or workplace hazards (including unprotected heights and dangerous machinery).

R. 22. This RFC precluded Matthew from returning to his past relevant work as an industrial truck driver and an order selector. R. 28. Based on the VE's testimony, however, ALJ Rippel found that a hypothetical worker with Matthew's RFC and vocational profile could perform certain unskilled "sedentary"[3] occupations (assembler, addressing clerk, and weight tester) that offered a significant number of jobs in the national economy. R. 29 (citing R. 58–61). Accordingly, ALJ Rippel found that Matthew was not disabled during the relevant period. *Id.* The Appeals Council denied Matthew's request to review the ALJ's decision, R. 1–3, and this appeal followed.

### III. Discussion

Matthew argues that the ALJ's denial of benefits is not supported by substantial evidence because the ALJ did not consider Matthew's "gastrointestinal disease[,] . . . its symptoms," and its functionally limiting effects. Pl.'s Br. 6. First, Matthew argues that ALJ Rippel's severity analysis is not supported by substantial evidence because he did not consider Matthew's hypercontractile gallbladder at any step of the disability determination. *Id.*; *see also* Pl.'s Reply 1–5, ECF No. 19. Second, Matthew argues that ALJ Rippel's RFC finding is not supported by substantial evidence because he did not consider Matthew's non-severe gastrointestinal

---

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). Sedentary work is the least physically demanding level of exertional work recognized in the regulations. *See id.* § 404.1567(a)–(e). Thus, a person who can do "light work" will also usually be able to do sedentary work, "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.* § 404.1567(a). Matthew does not challenge ALJ Rippel's exertional RFC findings on appeal. *See generally* Pl.'s Br. 6–9, ECF No. 13.

impairment of IBS after step two of the disability determination. *See* Pl.'s Br. 7. Matthew's second argument is persuasive.

A.    *Summary*

1.    *Treatment Records*

While living in Pennsylvania in 2018, R. 338, Matthew went to the emergency room for chest and epigastric pain, "had stress tests and cardiac workup[,] which were all negative[,] . . . . was diagnosed with costochondritis," and was sent home, R. 342. Then, on September 26, 2018, Matthew had a transition of care visit with Roger Palisoc, D.O. *Id.* Matthew had abdominal pain and tenderness in the right upper quadrant "with [M]urphy[']s sign," but his abdomen was soft, and he had normal bowel sounds. R. 343.

On October 3, Matthew had a follow-up appointment with Dr. Palisoc for his continuing abdominal pain. R. 345. He had an ultrasound of the right upper quadrant with normal results. *Id.* Matthew asked whether the pain "could be related to anxiety," noting that his shortness of breath, chest pain, and abdominal pain all "disappeared" when he took clonazepam (Klonopin) for a panic attack a few days earlier. *Id.* On examination, Matthew had a soft abdomen and normal bowel sounds. R. 345–46. Dr. Palisoc substituted sertraline (Zoloft) for Klonopin to treat his anxiety. R. 346. Matthew denied abnormal pain when he saw Dr. Palisoc in December 2018. R. 348.

On March 5, 2019, Matthew visited Dr. Palisoc for acute gallbladder pain. R. 352–53. Matthew reported that emergency room providers diagnosed him "with spasmic gallbladder that ha[d] been leaving him [in] recurrent" right upper quadrant abdominal pain over the past few weeks. *Id.* As such, he "wanted to discuss about cholecystectomy." *Id.* Exam findings were unchanged. R. 353. Dr. Palisoc referred Matthew to general surgery. *Id.*

6

Matthew moved to Culpeper, Virginia, on March 14, 2019. *See* R. 389. The next day, Emergency Medical Services transported him to the emergency room with weakness, constant abdominal pain in his right upper quadrant that radiated to his shoulder, nausea with vomiting, and a headache for the past six days. *Id.* Eating exacerbated his constant pain, and he had been having symptoms "intermittently over the past couple of months." *Id.* He reported that he had a history of gallstones and had been referred for cholecystectomy, but he moved out of Pennsylvania before he could see a surgeon. *See id.* On examination, he had a "[m]ildly tender" right upper quadrant. R. 390. An ultrasound of the gallbladder showed a "[m]ildly dilated common bile duct to 0.8 cm," but "[n]o gallstones or sonographic evidence of acute cholecystitis." R. 391. Providers prescribed tramadol as needed for "moderate pain" and ondansetron (Zofran) as needed for nausea. R. 394. Matthew agreed to follow up with a specialist later that week. *Id.*

On April 1, Matthew visited surgeon Christopher McCullough, M.D., for "epigastric pain, nausea[], [and] weakness." R. 402. Matthew had chest, back, and abdominal pain; diarrhea; and nausea. R. 411. He reported that his pain was "in the right anterior chest at the level and just above the costal margin," could "be sharp," and could "radiate to his neck on the right side" and his shoulder. R. 413. His abdominal pain had been present "for weeks, if not months." R. 412. He also experienced dizziness, nausea without vomiting, and weakness "almost daily" for the past month. R. 414. Matthew told Dr. McCullough that his doctor in Pennsylvania said that "he had gallstones and he needed to have his gallbladder out." R. 412.

Dr. McCullough noted that the March 15 ultrasound showed "no cholelithiasis, no gallbladder wall thickening, and no signs of acute cholecystitis. Hematology and serum chemistries [we]re normal." *Id.* Matthew's physical exam on April 1 was "unremarkable." *Id.*

7

His abdomen showed no distension, fluid wave, ascites, mass, hepatomegaly, tenderness, rigidity, rebound, guarding, or hernia. R. 411. He reported that his symptoms "may [have] be[en] related to eating fatty or greasy foods" because when those symptoms occurred, "they usually c[a]me on within a few minutes of eating." R. 413. Dr. McCullough opined that Matthew's "symptoms seem[ed] to be, at least in part, related to eating fatty or greasy foods," but that the symptoms' etiology was "unclear." R. 413. His symptoms "could [have] be[en] related to gastritis or ulcer disease." R. 412. "[B]iliary dyskinesia" could have been an alternative cause, but "the duration of [Matthew's] symptoms at times appear[ed] to be inconsistent with this" disorder. *Id.* Dr. McCullough determined that "at th[at] point there [wa]s insufficient data to justify recommending a laparoscopic cholecystectomy." *Id.* He prescribed daily omeprazole (Prilosec), R. 415, and ordered an HIDA scan to further evaluate "[a]bdominal pain with nausea and dizziness [present] intermittently for over 1 year," R. 424.

The HIDA scan showed "prompt, homogenous uptake of radiopharmaceutical throughout the liver" and "prompt identification of biliary tree and bowel." R. 424. Matthew's "gallbladder ejection fraction [wa]s 85%" and his "presenting symptoms were reproduced with CCK administration." R. 424. Radiologist Gregg Schubach, M.D., opined that "[t]he findings were suggestive of hypercontractile gallbladder, which is characterized by an ejection fraction of >= 85% in association with reproducible symptoms upon CCK administration." *Id.* Another radiologist, Betsy Inez, M.D., later wrote that a "hypercontractile gallbladder [was] noted on [this] nuclear biliary scan." R. 445. Dr. Inez made that notation in the context of interpreting a CT scan of Matthew's abdomen and pelvis. *Id.*

Matthew followed up with Dr. McCullough on April 15. R. 427. He was dizzy and had right upper quadrant, epigastric, and right shoulder pain. *Id.* He reported that he had fifteen to

twenty bowel movements daily for the last week. *Id.* He "fe[lt] bad all the time" and like he was "going to die." R. 439. He reported that he was "too sick" to work, drive, or see a doctor, but he he had "drive[n] himself and his two young daughters to [Dr. McCullough's] office" that day. R. 440. On examination, Matthew's abdomen was nontender. R. 440. Dr. McCullough recommended that Matthew "[r]eturn if symptoms worsen or fail to improve." R. 431. Then, Dr. McCullough wrote a letter referring Matthew to Zareen Barbar, M.D., a primary care physician. *See* R. 440. In the letter, Dr. McCullough noted that "[i]n the absence of cholelithiasis," Matthew's symptoms were "difficult to attribute to biliary dyskinesia alone." *Id.* "Given [Matthew's] description of his symptoms," Dr. McCullough "conservatively estimated that the chances of empirically removing the gallbladder and resolving [Matthew's] problems [we]re much less than 50%." *Id.* Matthew was "not particularly pleased" with this assessment. *Id.*

On April 16, Matthew visited Cynthia Napier, N.P., because he was nauseous and had had "diarrhea off and on for several days." R. 545. He reported that he felt "like [he] ha[d] the flu"; thought that "he ha[d] lost 5 pounds in the past month"; and had "had nausea and diarrhea intermittently for a year," "diarrhea 20+ times a day," "cold chills," and "lots of belching." R. 546. Taking an antacid did not help his symptoms. *Id.* Zofran helped somewhat, but he was out of that medication. *Id.*; *see* R. 358. Matthew looked "ill-appearing" on exam, but his abdomen was soft and nontender and had normal bowel sounds, no hepatomegaly, and no splenomegaly. R. 547.

The next day, Matthew went to the emergency room for chest and upper abdominal pain, "15 episodes of diarrhea" that day, lethargy, nausea, dizziness, and weakness. R. 356. He reported that "he started developing some diarrhea" about two weeks earlier, "ha[d] 15-20 bowel movements a day," and had something that "looked like pus" in his stool. R. 358. On

9

examination, his abdomen was soft, he had "[s]light epigastric tenderness with no rebound pain," and he was negative for Murphy's sign. R. 359. An ultrasound of the right upper quadrant was "negative for any evidence of cholecystitis or cholelithiasis." R. 357. The attending physician noted that the cause of Matthew's diarrhea "[wa]s unclear but d[id] not appear to be related to any infectious process." *Id.* He prescribed Bentyl and recommended that Matthew follow up with a gastroenterologist. *Id.*

On April 22, Matthew visited Nurse Napier. R. 543. He reported that he could not "walk more than 30 seconds without resting" or "think straight," was out of breath and "very confused," and had chest pain and "nausea without vomiting." R. 544. He also reported that Bentyl had "helped the diarrhea." *Id.* He was not taking the omeprazole that Dr. McCullough prescribed. *Id.* On examination, his abdomen was "tender in the epigastric area and [left upper quadrant] with possible enlarged spleen palpated," but it was soft and had normal bowel sounds and no hepatomegaly. R. 544. Ms. Napier planned to refer Matthew for a CT scan. R. 545.

On April 24, Matthew went to the emergency room because he had abdominal pain, nausea, and vomiting. R. 443. He reported that his pain was "constant and sharp mostly in his upper left quadrant." *Id.* He had been taking Bentyl, "which ha[d] helped with the diarrhea." *Id.* On examination, his abdomen was soft, had no rebound, was non-distended, and had normal bowel sounds, but the left upper and lower quadrants were tender to palpation. R. 444. An abdominal and pelvic CT scan showed a "[s]mall hiatal hernia," constipation, and a "[s]mall fat-containing umbilical hernia," but no bowel obstruction, free air or fluid, opaque cholelithiasis, or "evidence of renal calculus or hydronephrosis." R. 445. The impression was that Matthew's "[l]abs and CT were unremarkable (other than small hiatal hernia)." R. 447. The emergency

room "physician advised [Matthew] that" the hiatal hernia "might explain [his] symptoms." *See* R. 576. He recommended that Matthew see a gastroenterologist for possible endoscopy. R. 447.

Matthew saw gastroenterologist Emily Christman, M.D., on April 29. R. 576. He reported having left upper quadrant pain "for the last year," "weakness, flu-like symptoms, cold chills, brain fog, nausea[,] . . . dry heav[ing]," "up to 20 bowel movements per day," and weight loss of "20 pounds in the last month." *Id.* His daily episodes of abdominal pain "typically last[ed] 4-12 hours" and "he [wa]s afraid to eat because of his symptoms." *Id.* Matthew said that Bentyl was "very helpful for [his] abdominal pain and diarrhea," and he was "now back to his normal pattern of having one bowel movement every day." *Id.* On examination, Matthew's abdomen was nondistended, and he had normal bowel sounds, but he had "moderate tenderness in" his left upper quadrant ("improve[d] with distraction") and "mild epigastric tenderness." R. 578. Dr. Christman refilled Matthew's omeprazole, prescribed Bentyl and Zofran, and planned for Matthew to have an upper endoscopy. R. 579. She also noted that Matthew's reported "weakness, chills[,] and brain fog" probably were not related to a gastrointestinal problem "and that there may be several issues contributing" to those symptoms. *Id.* The small hiatal hernia was "not likely . . . contributing to abdominal pain." *Id.*

Dr. Christman performed the upper endoscopy on May 24. R. 581. On palpation, Matthew's abdomen was non-distended and not tender. R. 582. The endoscopy and resulting biopsies showed predominantly normal findings. *See* R. 583–84. There were no "findings . . . to explain left upper abdominal pain[, and] no hiatal hernia." *Id.* Dr. Christman concluded that the endoscopy "was fairly unremarkable" and "did not identify a cause for [Matthew's] symptoms." R. 515.

On June 14, Matthew followed up with Dr. Christman. R. 515–16. He reported that he had "left upper quadrant pain," "loose stool," "3-5 loose bowel movements daily," "weakness, flu-like symptoms, cold chills[,] and brain fog." R 515. He continued taking Bentyl "though he [wa]s not sure this [wa]s helpful." *Id.* He still took tramadol for abdominal pain. *Id.* He "ha[d] anxiety[,] which he attribute[d] to GI difficulties." *Id.* Dr. Christman renewed his Pantoprazole prescription and planned for him to have a celiac panel and take a hydrogen breath test for small intestinal bacterial overgrowth ("SIBO"). *Id.* She also recommended that he go on a lactose-free diet. *Id.* The celiac panel showed "[w]eakly positive" TTG IgG antibodies, leading to a recommendation that Matthew "decrease[] gluten intake." R. 590–91. When Matthew had the hydrogen breath test for SIBO, the only symptoms noted were gas and bloating. R. 592. The hydrogen breath test "was suggestive of" SIBO. R. 599. The colonoscopy showed "[n]ormal mucosa in the terminal ileum" and "whole colon" as well as "[s]mall[,] non-bleeding grade/stage I internal hemorrhoids." R. 597. Dr. Christman took biopsies from the left colon for histology "to evaluate for microscopic colitis." *Id.* The biopsies showed "[n]o pathologic abnormality," and there was "[n]o colitis seen." R. 563.

On July 29, Matthew visited Susan Suleske, P.A., for his anxiety and depression. R. 533–37. He reported that he "was told he ha[d]" irritable bowel syndrome ("IBS"). R. 535. He took Reglan and Bentyl as needed for those symptoms, "which ha[d] helped some." *Id.*; *see also* R. 515. He had no abdominal pain, but he had "frequent diarrhea." *Id.* PA Suleske diagnosed IBS without diarrhea. R. 536.

Matthew followed up with Dr. Christman on August 16. R. 599–601. Matthew reported that his "symptoms ha[d] improved." R. 599. Although he "continue[d] to have episodes of cramping and urgency," he "now ha[d] about three bowel movements daily" and did not have

"watery diarrhea." *Id.* He "[wa]s certainly feeling better in terms of his bowel pattern." *Id.* He

reported that "[h]e ha[d] been avoiding gluten for the last month[] and fe[lt] this ha[d] been

helpful." *Id.* He "complain[ed] of gas and belching," reporting that he could "burp 100 times a

day" even though he "d[id] not use gum or hard candy" or "think that he [wa]s swallowing air."

*Id.* Dr. Christman noted that his "chief complaint at this point [wa]s belching." *Id.* She

recommended that Matthew start a "[l]ow FODMAP [d]iet," "avoid carbonated beverages" and

"drink[ing] liquids with a straw," "separate food and liquids at mealtimes," and take a fiber

supplement. R. 601. She prescribed hyoscyamine sulfate (Levsin/SL 0.125mg) and discontinued

Bentyl. *Id.*

From June to September 2019, Matthew made several visits to a provider who treated his

back pain. R. 501, 616, 620, 624. On June 20, he "denied significant weight loss or bowel . . .

incontinence." R. 501. At a visit on July 11, he reported that he had diarrhea and "[d]ifficulty

controlling [his] stool." R. 624. In August and September, Matthew reported that he had no

diarrhea. R. 616, 620. Matthew saw Jiang Ming Mei, M.D., for a consultative physical exam on

September 4, 2021. R. 628–34. He reported "abdominal distress" and poor appetite. R. 628. On

examination, his abdomen was "[s]oft, non-tender, [and] non-distended with normally active

bowel sounds" and had "[n]o organomegaly or mass." R. 631.

     *2.*    *Medical Opinions*

In November 2020, Robert McGuffin, M.D., reviewed Matthew's medical records to

determine Matthew's physical RFC for DDS's initial review. R. 88–89, 92–95. He opined that

Matthew had a "severe" spine disorder with other and unspecified arthropathies. R. 89. Matthew

had "a history of IBS as well, but manage[d] with [a] gluten free diet and medications as

needed." R. 89. Matthew's IBS was a non-severe MDI. *See id.* Dr. McGuffin opined that

Matthew could sit and stand/walk each for about six hours (with normal breaks) during an eight-hour workday; occasionally lift/carry twenty pounds; and frequently lift/carry ten pounds. R. 93. He attributed these restrictions to Matthew's spine disorder, as well as to his "[h]istory of IBS" that had "[i]mproved with diet." *Id.* Dr. McGuffin also restricted certain postural activities and workplace environments to account for Matthew's severe spine disorder. R. 95.

On September 4, 2021, based on his assessment of Matthew, Dr. Mei opined that Matthew had certain limitations. R. 633–34. Matthew could stand "for 1 hour at a time and 6 hours total in an 8 hour workday due to positive straight leg raise bilaterally." R. 633. He had the same limitations on walking. *Id.* He "need[ed] an assistive device (cane) with regard to short and long distances and uneven terrain." *Id.* He could occasionally bend, stoop, crouch, and squat "due to positive straight leg raise bilaterally." R. 634. Matthew had no "visual, communicative[,] or workplace environmental limitations" and "ha[d] no limitations with sitting," "lifting[,] . . . carrying weight," "reaching, grasping, handling, fingering[,] and feeling." R. 633–34.

Robert McGuffin Jr., M.D., reviewed Matthew's updated medical records for DDS in October 2021. *See* R. 100–08. He adopted the elder Dr. McGuffin's opinion that Matthew's "history of IBS" was a non-severe MDI. R. 104. He also agreed that Matthew could sit and stand/walk (with normal breaks) for about six hours each during an eight-hour workday, but added that he "should alternate sitting and standing every hour" to relieve his lower back pain. R. 106–07. Dr. McGuffin Jr. did not identify any environmental limitations. R. 107.

### 3.    *Matthew's Statements*

Matthew completed several Disability Reports, Pain Questionnaires, and Adult Function Reports as part of this DIB claim. *See, e.g.*, R. 220, 230–31, 246–47, 249–64, 273–83. His statements on these forms almost exclusively describe the intensity, persistence, and functionally

limiting effects of his lower-back pain. *See* R. 220, 230–31, 246–47, 249–50, 252, 254, 256, 264, 269, 273, 281–82. Matthew struggles with sitting, R. 250, 274, 281, dressing, bathing, preparing meals, feeding himself, doing chores, driving or riding in a car, using public transportation, shopping, walking, standing, lifting objects heavier than five or ten pounds, concentrating, sleeping, completing tasks, bending, squatting, sitting, reaching, *see, e.g.*, R. 230–31, 246–47, 249–52, 254, 264, 273–77, 278, stooping, R. 247, remembering, R. 278, and climbing stairs, R. 254. He uses a cane. R. 220, 247, 255, 264, 279. He has panic attacks, R. 231, 254, 279, and he has difficulties with going out and being around others, R. 231. Matthew attributed all of these problems to his back pain and, to a lesser extent, to his anxiety and depression. *See* R. 220, 230–31, 246–47, 249–52, 254–55, 264, 273–79, 281–82. He did not mention any symptoms or functional limitations related to a gastrointestinal condition. *See generally* R. 230–31, 246–47, 249–64, 273–83. For example, Matthew reported that lower back pain affected his physical ability to use the toilet because wiping and sitting for too long were "painful." R. 250; *accord* R. 274 ("Use the toilet: sitting longer than a couple min[utes]. I can't stand up after."). He did not identify any gastrointestinal symptoms that affected his using the toilet. R. 250, 274.

On June 7, 2022, Matthew testified at an administrative hearing. R. 40–56. He testified that he has gastrointestinal issues, including IBS that causes "uncontrollable bowels" and diarrhea. R. 50. About "two to three times a week," he is "not able to get to the restroom" in time and defecates on himself. R. 50–51. He has "considered using adult undergarments," and he would sit on toilet paper. R. 51. He can no longer "eat normally" because food "goes right through" him. R. 52. He must use the restroom ten to fifteen minutes after eating. *Id.* Matthew did not describe any other gastrointestinal symptoms—including abdominal pain, nausea, or associated dizziness, weakness, or fatigue—during his hearing testimony. *See* R. 40–56.

4.      *The VE's Testimony*

At the administrative hearing on June 7, 2022, the VE testified that jobs like assembler, addressing clerk, and weight tester "would require eight hours a day, five days a week or an equivalent work schedule." R. 61. Normally, these jobs allow for one thirty-minute "meal break" and "two ten or 15-minute breaks on either side of two-hour intervals." *Id.* These jobs typically allow an additional "short restroom break in between the regular breaks that are normally given, but it usually can't be more than one and a duration of no longer than five minutes." *Id.* Supervisors at these jobs would tolerate "off[-]task behavior" for "no[] more than ten percent of the workday outside of the[] other breaks." R. 62. If a person was consistently off task more than ten percent of the time, "that [would] eventually become[] work preclusive." *Id.* Supervisors at these jobs would tolerate absenteeism of no more than "one day per month on a continuing basis." *Id.* If a person needed additional breaks, off-task time, or absences, that person would not be able to do any of the sample jobs "without getting fired." *Id.*

B.      *The ALJ's Decision*

At step two, ALJ Rippel determined that Matthew's "spine impairment (including lumbar degenerative disc disease, spondylosis, and right lumbar radiculopathy)" was a severe MDI. R. 19 (citing 20 C.F.R. § 404.1520(c)). He found "all other impairments alleged in the record to be non-severe, including [Matthew's] irritable bowel syndrome." R. 20. The ALJ explained that Matthew's primary care provider assessed him with IBS in July 2019 and instructed him to follow up with a gastroenterologist. *Id.* (citing R. 526). In August 2020, this provider refilled the hyoscyamine and Zofran that Matthew took for IBS. *Id.* (citing R. 536). The ALJ concluded that Matthew's IBS was a non-severe MDI because it had "been responsive to medication, not required significant medical treatment, [and not resulted in any continuous exertional or non-

16

exertional functional limitations." *Id.* He did not identify any other MDI(s) reflected in the record that might have caused Matthew's alleged abdominal pain, bowel movement frequency, nausea, or other gastrointestinal symptoms. *See* Pl.'s Br. 8–10 (discussing CT scan findings suggestive of hypercontractile gallbladder, R. 424).

Then, ALJ Rippel analyzed Matthew's RFC. *See* R. 22–28. He summarized certain aspects of the record, including some of Matthew's written statements and hearing testimony and some of the objective and other medical evidence in the record. R. 23–24. The ALJ did not mention Matthew's statements about his gastrointestinal symptoms. R. 23–24. While ALJ Rippel mentioned in passing that Matthew's treatment record included visits during which Matthew complained of gallbladder pain, abdominal pain, nausea, and vomiting, R. 23, he did not discuss any examination findings or test results related to his gastrointestinal issues, *see* R. 22–28.

ALJ Rippel found that Matthew's MDIs "could reasonably be expected to cause the alleged symptoms," but that Matthew's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record," R. 24. His credibility analysis addressed only Matthew's statements about his spinal impairment and its resulting symptoms. *See* R. 23–25. He concluded that Matthew's statements about his back pain were "inconsistent with the medical evidence," R. 24, because, while Matthew "has impairment of the spine, his treatment notes reveal[] this condition is relatively stable on medication, has required minimal treatment, and findings on examinations have been unremarkable." R. 25. He noted that besides "tenderness, ambulation with a single point cane," and pain limiting the lumbar spine's range of motion, *id.* (citing R. 353, 538, 540, 617, 621), Matthew "had normal inspection of the musculoskeletal system and extremities with no focal neurological deficits, normal range of motion, back and neck were non-

tender with full range of motion, and he moved all extremities with good strength during

emergency room examinations," *id.* (citing R. 359–60, 390–91, 444), and he "had no weakness

of the extremities, normal gait and station, normal sensation, negative straight leg raise testing,

and 2+ deep tendon reflexes in the bilateral lower extremities during examinations by the

primary care provider, the orthopedist, and pain management," *id.* (citing R. 411, 474–75, 528,

530, 533, 536, 540, 542–44, 547, 626). The ALJ also found that treatment for Matthew's spine

impairment and resulting back pain "consisted of the administration of lumbar epidural steroid

injections, a home exercise program, and the prescription of medications including oral steroids,

Flexeril, Ibuprofen, and a recommendation for the use of CBD oil." *Id.* (citing R. 353, 476, 539,

543, 618–19, 622–23, 626). The ALJ concluded that Matthew was limited to light work with a

sit-stand option, reduced postural demands, and only occasional exposure to certain workplace

environments "due to this impairment of the spine." R. 25.

Then, ALJ Rippel evaluated the medical-opinion evidence in the record, R. 25–27, and

the prior ALJ's decision, R. 27–28. ALJ Rippel found that the DDS physicians' "opinions [we]re

persuasive" because "they [we]re supported by and consistent with the medical evidence of

record." R. 25. He determined that Matthew would need "the flexibility to use a cane when

walking" and could occasionally climb ramps and stairs, balance, and have "exposure to

vibration or workplace hazards." R. 25–26. The ALJ found that Dr. Mei's "opinion ha[d] little

persuasiveness" because "with the exception of limitations including occasional stooping,

kneeling, crouching, and crawling," the limitations Dr. Mei identified were "not supported by

[Dr. Mei's] own findings." *Id.* The ALJ determined that "[t]he medical evidence of record [wa]s

consistent with other, less extreme limitations," including "the flexibility to alternate between

sitting and standing at 1-hour intervals," using a cane, and working "at the light exertion level

18

with no climbing ladders/ropes/scaffolds or crawling; occasional climbing ramps and stairs,

balancing, stooping, kneeling, crouching[,] . . . and exposure to extreme cold, extreme heat,

vibration[,] and workplace hazards." R. 26–27. Finally, ALJ Rippel gave the prior ALJ's

decision "great weight through the date of th[at] decision." R. 27. However, ALJ Rippel found

that "medical evidence received after the prior decision" did not support limitations of

"standing/walking less than 2 hours in an 8-hour workday, sitting less than 2 hours in an 8-hour

workday, . . . only occasional exposure to wetness and humidity," and being "absent from work

more than 4 days a month and [] off task more than 15% of the workday." *Id.* ALJ Rippel found

that Matthew would also need "a limitation on exposure to extreme heat," "the flexibility to use a

cane when walking," *id.* (citing R. 617, 620, 627–34), and "to alternate between sitting and

standing at 1-hour intervals," *id.* (citing R. 538, 540). However, ALJ Rippel "agree[d] with the

prior ALJ that [Matthew] d[id] not meet or equal a [L]isting, c[ould ]not perform past relevant

work, but can perform other work after September 2, 2017." *Id.*

C.    *Discussion*

        Matthew argues that the ALJ's denial of benefits is not supported by substantial evidence

because the ALJ "effectively gave no consideration" to Matthew's "gastrointestinal disease[,] . . .

its symptoms," and its functionally limiting effects. Pl.'s Br. 6. First, he argues that ALJ Rippel's

severity analysis was not supported by substantial evidence because he did not consider

Matthew's hypercontractile gallbladder anywhere in the decision. *Id.*; *see also* Pl.'s Reply 1–5.

Second, Matthew argues that ALJ Rippel's RFC finding was not supported by substantial

evidence because he did not consider Matthew's non-severe gastrointestinal impairment of IBS

after step two. *See* Pl.'s Br. 7.

        1.    *Failure to Consider Hypercontractile Gallbladder*

19

Matthew argues that ALJ Rippel's severity analysis at step two is not supported by substantial evidence because he did not consider Matthew's hypercontractile gallbladder at any step of the disability determination.[4] Pl.'s Br. 7–9; *see also* Pl.'s Reply 1–5. At step two, ALJ Rippel found that Matthew had a severe spine impairment and that "all other impairments alleged in the record [were] non-severe, including [Matthew's] irritable bowel syndrome." R. 20 (citing R. 526, 536). He did not specifically mention "hypercontractile bladder" in his decision. *See* R. 19–28. "To determine whether an ALJ should have considered evidence of an impairment, courts consider whether the claimant indicated the impairment limited his ability to work on his disability application or at his administrative hearing, and whether the claimant consistently and frequently complained about the impairment to his doctors, and, if so, when any such complaints occurred relative to the alleged onset date." *Sherri S.*, 2022 WL 2070454, at *6.

Matthew did not present a claim of gastrointestinal issues of any kind in his application for benefits. *See* R. 81. However, he offered "gastrointestinal distress" as a basis for disability at the hearing, R. 40; he repeatedly complained to his doctors about his gallbladder and related symptoms from September 2018 to September 2021, *see, e.g.*, R. 338–43, 345–46, 352–53, 356–58, 389–91, 401–13, 424, 427–40, 545–47; and his HIDA scan showed an ejection fraction of eighty-five percent and his "presenting symptoms were reproduced with CCK administration," R. 424. Dr. Schubach opined that the HIDA scan findings were "suggestive of hypercontractile gallbladder," R. 424, and Dr. Inez later commented that "hypercontractile gallbladder [had been]

---

[4] Matthew also argues that ALJ Rippel's severity analysis is not supported by substantial evidence because the ALJ did not consider Matthew's hiatal hernia. Pl.'s Br. 7–9. Although a CT scan initially showed a small hiatal hernia, R. 445, an endoscopy later showed no hiatal hernia, R. 583. As such, the record does not show that this alleged impairment is an MDI, 42 U.S.C. § 423(d)(3) (an MDI "is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques"), and ALJ Rippel did not err by not considering it, *see Sherri S. v. Kijakazi*, No. 7:21cv327, 2022 WL 2070454, at *6 (W.D. Va. June 8, 2022).

noted" on that scan, R. 435. But no medical professional definitively diagnosed Matthew with

"hypercontractile gallbladder, or biliary hyperkinesia," as he calls it, Pl.'s Br. 3, during the

relevant time. Nor did any provider attribute Matthew's gastrointestinal symptoms to that

medical condition. Accordingly, Matthew has failed to show that this impairment qualifies as an

MDI that ALJ Rippel should have explicitly considered in his disability determination. *Compare*

*Sherri S.*, 2022 WL 2070454, at *6, *with Bonvillain v. Berryhill*, No. 1:18cv978, 2019 WL

1232840, at *13–14 (E.D. Va. Mar. 15, 2019) (finding that the ALJ should have considered the

plaintiff's neck impairment, even though she did not allege it in her application or at the hearing,

because her "records [we]re replete with neck pain complaints and MRIs as well as a definite

diagnosis").

      Even if ALJ Rippel should have considered hypercontractile gallbladder, his failure to do

so at step two would be harmless because "it is inconceivable" that this error would have

changed the outcome of the ALJ's disability determination. *See Kersey v. Astrue*, 614 F. Supp.

2d 679, 696 (W.D. Va. 2009). At the hearing, Matthew did not attribute any gastrointestinal

symptoms to a hypercontractile gallbladder specifically. *See* R. 40–56. Even before this Court,

Matthew asserts that his "gastrointestinal disease"—which he defines as "hyper contractile

bladder, irritable bowel syndrome, and [alleged] hiatal hernia" collectively—causes the

abdominal pain and "uncontrolled and frequent diarrhea" that "might warrant a special

accommodation about sitting close to a restroom[] so he does not have an accident." Pl.'s Br. 8–

9. The ALJ found that Matthew's IBS was a non-severe MDI. R. 20. Matthew's position that his

non-severe IBS causes the same symptoms and alleged functional limitations as hypercontractile

gallbladder renders the ALJ's failure to expressly consider the latter impairment harmless.

Nonetheless, ALJ Rippel did not explain his conclusion that Matthew's IBS had "not resulted in

*any* continuous . . . non-exertional functional limitations," R. 20 (emphasis added), and then

failed to properly consider Matthew's IBS symptoms and alleged non-exertional limitations as

part of his RFC assessment, *see* R. 22–27. That error warrants remand for further proceedings.

2.      *IBS & RFC Analysis*

A claimant's RFC is his "maximum remaining ability to do sustained work activities in

an ordinary work setting" for eight hours a day, five days a week despite his medical

impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis

omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case

record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it

should reflect specific, credibly established "restrictions caused by medical impairments and

their related symptoms" that affect the claimant's "capacity to do work-related physical and

mental activities" on that basis, SSR 96-8p, 1996 WL 374184, at *1–2. *See Mascio v. Colvin*,

780 F.3d 632, 637–40 (4th Cir. 2015). Generally, a reviewing court will affirm the ALJ's RFC

findings when it is clear he considered all the relevant evidence under the correct legal standards,

*see Brown v. Comm'r Soc. Sec. Admin.,* 873 F.3d 251, 268–72 (4th Cir. 2017), and his written

decision builds an "accurate and logical bridge from that evidence to his conclusion," *Woods v.*

*Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (cleaned up), *superseded on other grounds as*

*recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023).

When assessing a claimant's RFC, an ALJ "must consider all of the claimant's physical

and mental impairments, severe and otherwise." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir.

2019) (cleaned up); *see also* 20 C.F.R. § 404.1545(a)(1)–(2). Although "an ALJ is not required

to discuss non-severe impairments in the RFC analysis so long as [he] considered them in the

decision," *Lori A.J. v. Kijakazi*, No. 2:22cv131, 2023 WL 3069394, at *6 (E.D. Va. Apr. 5,

2023), *adopted*, No. 2:22cv131, 2023 WL 3060789 (E.D. Va. Apr. 24, 2023), "[f]ailure by the

ALJ to consider a claimant's non-severe impairments at subsequent steps of the RFC analysis

requires remand." *Janet L. v. Saul*, No. 19-2544, 2021 WL 1733469, at *8 (D. Md. Apr. 30,

2021); *see also Cynthia Ann M. v. Comm'r of Soc. Sec. Admin.*, No. 8:22cv1051, 2023 WL

1482737, at *10–12 (D.S.C. Jan. 17, 2023) (determining that because the ALJ did not consider

the plaintiff's non-severe physical impairments after step two, the ALJ's decision was not

supported by substantial evidence), *adopted sub nom. Moore v. Comm'r of Soc. Sec. Admin*, No.

8:22cv1051, 2023 WL 1481064 (D.S.C. Feb. 1, 2023).

ALJ Rippel did not discuss Matthew's IBS at all after he found that the MDI caused no

functional limitations and was non-severe. *See* R. 20–29. At step two, the ALJ's entire discussion

of the medical evidence of Matthew's gastrointestinal issues and analysis of any related

functional limitations consisted of only a few sentences. R. 20. In his RFC analysis, the ALJ

noted that Matthew saw "his primary care provider in March 2019 for complaints of

gall[]bladder pain and a back injury," saw his "primary care provider in April 2019 for reports of

nausea and vomiting," and went to the emergency room "later in April 2019 for abdominal pain,

nausea, and vomiting," but the ALJ considered examination findings and test results from these

visits only to the extent they were related to Matthew's spine impairment and resulting back

pain. R. 23. The ALJ did not mention findings, results, or specific symptoms noted at these visits

related to Matthew's IBS. *See id.* While these short, passing references vaguely gestured toward

Matthew's gastrointestinal issues generally, the ALJ's written decision as a whole indicates that

he did not consider Matthew's IBS symptoms as part of his RFC analysis. *See* R. 22–28.

Additionally, the ALJ's truncated discussion of Matthew's gastrointestinal issues  is

problematic because the ALJ found that Matthew's MDIs, which according to his step two

finding included IBS, "could reasonably be expected to cause the symptoms" that he described in his hearing testimony, but that Matthew's "statements concerning the intensity, persistence, and functionally limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." R. 24; *see* 20 C.F.R. § 404.1529(c). As noted, the ALJ's reasons for discounting Matthew's statements all address the pain and physical limitations resulting from his severe spinal impairment. Nothing in the ALJ's decision indicates that the ALJ also considered Matthew's statements describing how his IBS-related symptoms impact his ability to work. *See* 20 C.F.R. § 404.1529(c). The ALJ's inadequate discussion of the medical evidence and Matthew's subjective statements regarding his gastrointestinal problems at step two precludes meaningful review of the ALJ's assessment of any related functional limitations. *See Cynthia Ann M.*, 2023 WL 1482737, at *11–12.

This error is not harmless. Matthew asserts that his IBS-related symptoms "might warrant" an RFC finding that he needed extra breaks to use the restroom and that he be seated near a restroom at work. Pl.'s Br. 9. Based on the VE's testimony that employers usually allow an additional "short restroom break in between the regular breaks that are normally given, but it usually can't be more than one and a duration of no longer than five minutes," R. 61, Matthew notes that the limitations he identifies might render him disabled, Pl.'s Br. 9. Thus, the ALJ's failure to consider Matthew's IBS-related symptoms as part of his RFC assessment warrants remand. *See Anthony M. v. Comm'r, Soc. Sec. Admin.*, No. 19-651, 2020 WL 434581, at *3 (D. Md. Jan. 28, 2020) (finding that the ALJ erring by failing to consider the plaintiff's non-severe impairments in the RFC warranted remand because the plaintiff demonstrated that consideration of the non-severe impairments may have warranted additional limitations that might have rendered him disabled).

24

IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge

**DENY** the Commissioner's motion for summary judgment, ECF No. 17, **REMAND** the matter

under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active

docket.

<u>**Notice to Parties**</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and
Recommendation], any party may serve and file written objections to such
proposed findings and recommendations as provided by rules of court. A judge of
the court shall make a de novo determination of those portions of the report or
specified proposed findings or recommendations to which objection is made. A
judge of the court may accept, reject, or modify, in whole or in part, the findings or
recommendations made by the magistrate judge. The judge may also receive further
evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is

directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel

of record.

ENTER: February 9, 2024

Joel C. Hoppe
United States Magistrate Judge